UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
KAREN KINCAID BALMER, as Receiver for
Olympia Mortgage Corporation,

                               Plaintiff,                            **OPINION AND ORDER**

   - against -                                                        05 CV 839 (NG) (MDG)

1716 REALTY LLC and 1716 REALTY
CORPORATION,

                               Defendants.
-------------------------------------------------------------x

**GERSHON, United States District Judge:**

      Plaintiff Karen Kincaid Balmer is the court-appointed Receiver for Olympia Mortgage Corporation ("Olympia"), the mortgage company alleged to have perpetrated a massive fraudulent scheme against Federal National Mortgage Association ("Fannie Mae"). *See Federal Nat'l Mortgage Ass'n v. Olympia Mortgage Corp.*, No. 04-4971 (E.D.N.Y. filed Nov. 16, 2004) ("*Fannie Mae v. Olympia*"). In her capacity as Receiver, plaintiff brings this action to pierce the corporate veil of defendants 1716 Realty LLC ("1716 LLC") and 1716 Realty Corporation ("1716 Corporation"), two entities owned by Olympia's principals and formed to manage an office building from which Olympia could conduct its business. Plaintiff moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking a declaratory judgment that these entities are alter egos of Olympia and that Olympia is therefore the legal owner of defendants' assets. Alternatively, plaintiff moves for partial summary judgment on her claim for moneys had and received. Defendants also move for summary judgment on their counter-claim for rent allegedly due and owing from Olympia, or, in the event trial is needed, for consolidation of this case with the underlying action of *Fannie Mae v. Olympia*.

1

## BACKGROUND

Olympia is a New York corporation that acted as a mortgage lender and servicer from 1986 until November 4, 2004, when the company surrendered its license following a suspension by the New York State Department of Banking. Olympia has no record of its directors being formally elected and only a single record of a corporate meeting held during its approximately 20 years of conducting business. From at least 1998, Olympia was an insolvent company.

On November 16, 2004, Fannie Mae, a government-sponsored private corporation that had purchased thousands of mortgages originated by Olympia and had retained Olympia to service those mortgages, filed suit against Olympia and various individuals and entities with an interest in that company alleging fraud and breach of contract.[1] In short, Fannie Mae alleges that, with respect to approximately 260 loans, Olympia failed to provide it notice when borrowers attempted to pay off their existing loans through refinancing. Instead, Olympia's principals collected the pay off amounts for themselves, and, in order to prevent Fannie Mae from learning of the refinancing, Olympia continued to make monthly payments on the loans and reported the status of the loans as "active."

On August 27, 2007, the court entered a Consent Judgment against Olympia on Fannie Mae's contract claims in the amount of $44,800,000. Olympia stipulated in the Consent Judgment that it breached its fiduciary duty to Fannie Mae and its contract with Fannie Mae to "remit loan payoff amounts owed to Fannie Mae in a timely manner and fully and honestly inform Fannie Mae with regard to the loans Olympia serviced for Fannie Mae." Olympia further admitted that, as a result of its breach, it "gained an improper financial benefit for itself."

---

[1] The details of the case are set forth in further detail in previous decisions. *See, e.g.*, *Fannie Mae v. Olympia*, 2006 WL 2802092 (E.D.N.Y. Sept. 28, 2006) (granting in part and denying in part plaintiff's and cross-claim defendants' motions to dismiss).

Various other claims and counter-claims remain pending in *Fannie Mae v. Olympia*, including a claim against 1716 Corporation for actual and constructive fraud in violation of Article 10 of the New York Debtor and Creditor Law. Although the Receiver alleged various cross-claims against several individuals and entities in that action, she did not name 1716 Corporation as a cross-claim defendant. However, on February 11, 2005, the Receiver filed this action against 1716 Corporation and 1716 LLC.

## FACTS

The following facts are undisputed unless otherwise indicated:[2]

Olympia, 1716 Corporation, and 1716 LLC are all entities owned by various members of four families, namely those of Avruhum ("Abe") Donner, Barry Goldstein, Leib Pinter, and Sam Pinter.[3] Olympia's principals formed 1716 Corporation on June 23, 1998 under New York State laws and 1716 LLC on September 7, 2000 as a Delaware limited liability company. Both of the companies were capitalized entirely by Olympia's profits; none of the defendants' owners contributed any equity to the companies. All of the costs associated with 1716 Corporation's formation, including filing and legal fees, were also borne by Olympia.

---

[2] Defendants did not include in their opposition to plaintiff's motion for summary judgment any statement disputing plaintiff's material facts, as required under Local Rule 56.1(b). Defendants filed only their own statement of undisputed facts in support of their motion for summary judgment, to which plaintiff has responded. Under Local Rule 56.1(c), "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted . . . in a statement required to be served by the opposing party." Nonetheless, the court has reviewed the parties' Rule 56.1 statements with the record to determine whether the evidence cited supports the assertions made.

[3] The shareholders of Olympia, as of September 6, 2003, were: Abe Donner (32%), Fagie Pinter (32%), Sam Pinter (9%), Barry Goldstein (9%), Miriam Goldstein (8.5%), and Shaindy Pinter (8.5%). The shareholders of 1716 Corporation include: Abe Donner (22.222%), Fagie Pinter (22.222%), Barry Goldstein (33.333%), and Shaindy Pinter (22.222%). The shareholders of 1716 LLC include: Barry Goldstein (33.3341%), Abe Donner (22.222%), Fagie Pinter (11.111%), Sam Pinter (11.111%), Shaindy Pinter (11.111%), and Leib Pinter (11.111%).

Defendants were formed to own and manage an office building on a parcel of real estate that had been purchased by Olympia in February 1998, before either defendant had been formed.[4] The decision was made pursuant to a "general agreement" among Olympia's principals that the company needed a "better physical structure and location . . . to advance the needs of the business." Olympia did not document the decision in writing but entered into a contract to purchase 1716 Coney Island Avenue, Brooklyn, New York ("the Property") for $575,000 and paid $10,000 on deposit. On or about September 17, 1998, Olympia sold the land to 1716 Corporation for $565,000, but funded $210,000 of the purchase price and guaranteed the balance in the form of a $355,000 loan from European American Bank. Olympia thereafter made all of the mortgage payments on the loan while it remained open and paid for subsequent property acquisition and development expenses, including architect fees, permit and extension costs, and mortgage lending fees. Olympia also guaranteed 1716 Corporation's construction loan obtained on June 22, 2000, without executing a written agreement regarding the terms of the loan, and it eventually provided all of the funds to pay off the loan. Defendants did not pay any interest or provide any security for repayment of the loan. Mr. Goldstein testified that because "[i]t was almost like lending it from one place to the other to be paid back . . . , [t]here was no interest that was supposed to have been paid."

In December 2002, 1716 Corporation entered into a new mortgage loan agreement, guaranteed by Olympia and 1716 Corporation's principals, with General Electric Capital Corporation for $1,550,000. Olympia's records indicate that the loan is a "receivable" from 1716 Corporation and that Olympia has made $208,370.00 in mortgage payments on the loan.

---

[4] According to defendants, 1716 LLC was formed to hold 1716 Corporation's assets for tax purposes but, for unknown reasons, title to its assets was not transferred. In all respects, and as defendants themselves acknowledge, the companies were viewed "as one and the same."

The loan remains a lien on the building. The proceeds of the loan, net of closing costs and final payment of the first mortgage loan with European American Bank, which amounted to $1,323,245.44., was wired to an Olympia account. Olympia's records indicate that the sum was distributed in the following manner: (1) $501,000 was immediately transferred to a purported religious not-for-profit entity named Kahal Somrei Hadath ("KSH") and controlled by Sam Pinter; (2) $200,000 was immediately transferred to Midwood Federal Credit Union ("Midwood") and used to pay off two personal loans to Sam Pinter and Leib Pinter for $100,000 each; (3) $205,000 was immediately transferred to an account at Midwood held by Yeshiva Yaakow Moshe and was later distributed to Sam Pinter and Leib Pinter's children and spouses through checks in either $15,000 or $20,000 amounts; (4) $426,946 was used for the following: operating expenses and construction costs for 1716 Corporation, other payments to related parties and related party noteholders, benefits for principal owners and related parties, personal credit card expenses, car payments, and payments to Fannie Mae for loans falsely noted as "active."

In addition to helping defendants purchase and construct the Property, Olympia paid for other of defendants' expenses. From 1998 to 1999, Olympia paid for 1716 Corporation's income and franchise taxes, insurance, architectural fees, and demolition and construction costs from its own operating account. In some instances, Olympia recorded these expenditures as company expenses rather than loans. Olympia also provided personnel services to defendants, such as accounting, bookkeeping, purchasing, and administration, without receiving compensation in return. An Olympia employee maintained all of defendants' files at its office, and defendants' mail was frequently delivered "in care of" Olympia. Olympia employees even wrote letters on behalf of 1716 Corporation using Olympia letterhead, and vendors involved in projects with

defendants sent proposals and invoices directly to Olympia. At all times, defendants shared office space, addresses, and phone numbers with Olympia.

In or about the middle of 2003, construction on the Property was completed. Pursuant to a lease signed by Olympia in December 2002, Olympia agreed to pay an annual rent of $345,000 for occupancy of the second and third floors of the office building. Olympia's books contain an offset of $13,333.33 per month for those months that Olympia could not occupy the building.

In November 2004, around the same time that Olympia was placed under receivership, Sam Pinter assumed control of defendants from Barry Goldstein. In addition to maintaining the two bank accounts held in 1716 Corporation and 1716 LLC's names at Independence Bank, Sam Pinter opened additional accounts at Chase Bank by the end of 2004. Since then, all of 1716 LLC's finances, including outstanding mortgage payments on the Property and all utility and maintenance expenses, have been run through the Chase accounts and paid for by 1716 LLC. All rents generated by the Property, apart from those allegedly due and owing from Olympia, have been deposited in these accounts as well.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing

the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment", *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), but "must come forward with specific facts showing that there is a genuine issue for trial", *Matsushita*, 475 U.S. at 586-8 (emphasis removed).

## II.     Piercing the Corporate Veil

The concept of piercing the corporate veil is a limitation on the accepted principle that a corporation is independent of its owners and that, as a separate legal entity, the owners are normally not liable for the corporation's debts. *See Morris v. N.Y. State Dept. of Taxation & Finance*, 82 N.Y.2d 135, 140 (1993). Although New York courts are reluctant to disregard the corporate form, they will do so "when the form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . , and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego."[5] *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979). Because the concept is equitable in nature, the decision to pierce the corporate veil is not "reduced to definitive rules" but will "necessarily depend on the attendant facts and equities." *Morris*, 82 N.Y.2d at 141. Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination over the corporation with respect to the transaction at issue; and (2) that this domination was used to commit a "fraud or wrong" against the plaintiff, which resulted in plaintiff's injury. *Id.*; *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988), *cert. denied*, 488 U.S. 852 (1988).

---

[5] In New York, the standards for imposing liability under an alter ego theory and piercing the corporate veil theory are "indistinguishable, do not lead to different results, and should be treated as interchangeable." *Wm. Passalacqua Builders*, *Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991).

7

A.      **Complete Domination**

A showing of complete domination is "the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business." *Morris*, 82 N.Y.2d at 141-42. There are a number of factors that can be considered when deciding whether such domination and control exist, including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, the issuance of stock, election of directors, keeping of corporate records, and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua*, 933 F.2d at 139. There is "no set rule as to how many of these factors must be present in order to pierce the corporate veil, [but] the general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir. 1989).

Here, as to many, if not all, of the factors, the record is replete with evidence that defendants and Olympia were inextricably intertwined entities and that, through their common owners, defendants completely dominated Olympia and used the corporate form to further personal rather than business ends. To begin with, there is no evidence to indicate that these entities abided by any of the corporate formalities associated with incorporation. As to Olympia, which acted as a mortgage lender and servicer for nearly 20 years, there is only a single record of a corporate meeting and no records indicating that its directors were ever formally elected. Apart from one corporate resolution, which granted a loan to defendants but did not contain any terms

relating to interest, security, or repayment, none of the other financial transactions between Olympia and defendants are documented. There is also no evidence that Olympia even attempted to place a value on, or keep records of, the various administrative and personnel services it provided defendants.

The record also establishes that Olympia was an inadequately capitalized company. From 1998 until 2004, when it was placed under receivership, Olympia was insolvent and possessed a growing liability to its creditors that exceeded its cash, shareholders' equity, and net income. Yet despite its insolvency, Olympia funds were taken out of the corporation for the owners' personal purposes. Olympia's records indicate that the proceeds of the General Electric mortgage loan, the sum of which was wired to its corporate account, was not used for Olympia's purposes but to pay off the personal loans and expenses of its owners.

There is undisputed evidence in the record establishing that defendants and Olympia maintained an informal relationship in significant respects. At all times, defendants and Olympia shared office spaces, addresses, and telephone numbers. Mail for defendants was delivered in "care of" Olympia, and vendors handling construction and development of the Property sent proposals and invoices directly to Olympia. Olympia employees wrote letters on behalf of defendants on Olympia letterhead. In addition to the administrative overlap, defendants and Olympia were owned and directed by nearly the same group of people. Of the six owners of defendants, Leib Pinter was the only member who did not also possess ownership interest in Olympia. Barry Goldstein, Abe Donner, Fagie Pinter, Sam Pinter, and Shaindy Pinter were all owners of Olympia as well as of defendants. Before Sam Pinter assumed control of defendants in late 2004, Barry Goldstein acted as the President of 1716 Corporation, Managing Director of 1716 LLC, and the Vice President and Managing Director of Olympia.

Defendants' principals admitted during their depositions that the reason for an absence of corporate formalities between defendants and Olympia was this common ownership. Their testimony also corroborates other evidence in the record that defendants, through their common owners, were able to dominate Olympia to the extent that they stripped Olympia of any business discretion and caused it to enter into transactions that were neither arms-length nor profitable for the company. Despite its insolvency, Olympia advanced money for the Property, paid for other related expenses, and guaranteed defendants' construction and mortgage loans without providing for any terms relating to security, interest, or repayment. Barry Goldstein, who often directed and authorized Olympia to pay defendants' expenses, testified that these "loans" did not provide for repayment terms because "[t]he same people owned Olympia as owned the realty company . . . [and it] was almost like lending it from one place to the other to be paid back." An Olympia employee confirmed that Barry Goldstein would direct her to pay defendants' bills from Olympia's operation account because "[a]s far as [the owners] were concerned, [the Property] was an Olympia project", and since defendants and Olympia were under common ownership, "it did not matter which company paid the bills." Sam Pinter unequivocally testified that Olympia was "hijacked" by its owners and "used for their own purposes." He similarly testified on a later date that "[t]here was no benefit to Olympia from making these payments" to defendants but that "the benefit was to the owners of Olympia and 1716."

Taken together, the above evidence demonstrates that defendants dominated and controlled Olympia to use it for the personal purposes of their common owners. While defendants argue that "superficial indicia such as common offices and telephone numbers between corporate entities is not enough" to establish alter ego liability, they do not dispute the other pieces of evidence establishing the element of domination and control. Defendants' one

10

submission, an affidavit from Sam Pinter, contains conclusory statements and no evidence that raises a genuine issue of material fact. For instance, Sam Pinter states that "1716 has been fairly run as a separate business from Olympia and is not in any way, shape or form the same as Olympia", and he attaches defendants' earliest bank statement, dated November 30, 2004, and several tenant leases, all but one of which were entered into during 2004 and 2005. At most, defendants' evidence establishes that, only since late 2004, defendants have abided by *certain* corporate formalities, such as maintaining bank accounts, paying the outstanding mortgage loan, and leasing other units to independent tenants. Indeed, defendants admit as much in their brief by arguing that "[c]learly since November 2004, 1716 has functioned as a viable business without any involvement by Olympia." Dfs. Mem. at 16. These recent changes implemented by defendants, however, do not contradict the evidence presented by the Receiver regarding the owners' domination and control over Olympia. Indeed, Sam Pinter's assertion of independence is belied by the fact that he himself identified the Property as an Olympia asset that could be liquidated to pay off certain debts he owed to an Olympia creditor. In a letter dated October 31, 2004 to Independence Community Bank, Sam Pinter "compiled a thorough list of assets that [Olympia] feel[s] can be liquidated in the next six to twelve months" and included "1716 Coney Island Avenue – a six story office building" within that list.

### B. Use of Domination to Perpetrate a Wrong

A showing of complete domination is the key to piercing the corporate veil, but such domination, standing alone, is not enough. New York law requires a showing that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against plaintiff, which resulted in plaintiff's injury. *See Morris*, 82 N.Y.2d at 141-42; *Passalacqua*, 933 F.2d at 137-39. A plaintiff may be considered injured

when a company is rendered unable to pay the claims pending against it by third parties because of another company or individual's domination of the business. *See, e.g.*, *Austin Powder Co. v. McCullough*, 216 A.D. 825, 827 (N.Y. App. Div. 1995).

As already discussed, the record is clear that defendants and Olympia were operated as one entity without regard for their separate corporate structures. Significant here, there is undisputed evidence that defendants siphoned off millions of dollars from Olympia during a time when the company was insolvent and faced increasing liability to its creditors. As a result, Olympia was not able to satisfy its debts. The Receiver, bringing suit on behalf of Olympia's creditors, has demonstrated sufficient injury resulting from defendants' domination of Olympia.

The ultimate question in piercing the corporate veil cases is whether "in light of the circumstances, the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form—the need to protect those who deal with the corporation." *Carte Blanche (Singapore) Pte., v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) (internal quotation marks omitted). The totality of the circumstances, as supported by the record evidence, indicates that the harm suffered by Olympia's creditors was the result of the domination and control of Olympia by defendants' owners. Imposing liability here reaches an equitable result. *See Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979). Defendants cannot now, after using the corporate form to further their personal ends, seek to use the same corporate form to avoid their obligations and protect their assets from Olympia's creditors.

### III. Relief Requested

In Count I of her Amended Complaint, the Receiver requested the court enter a declaratory judgment that: (1) Olympia is the legal owner of all of defendant's assets, including

the right, title, and interest to the property known as 1716 Coney Island Avenue, Brooklyn, New York 11230 (the "Property"); (2) the Receivership extends to those assets formerly owned by defendants; (3) Olympia owes no past or future rent or other amounts to defendants in connection with its occupancy of the Property; and (4) defendants and all other persons claiming interest thereunder are barred from all claims to legal estate or interest in the premises and Olympia is entitled to sole and complete possession of the premises as the legal and equitable owner. Am. Compl. ¶ 34. In the Receiver's motion for summary judgment, she requests the same relief and argues that it ought to be granted for equitable reasons. Specifically, the Receiver argues that defendants' assets should be applied to compensating Olympia's outstanding creditors rather than benefitting the same owners who caused defendants to dominate Olympia for their personal benefit and that alternative remedies, such as claims for moneys had and received or unjust enrichment, will be inadequate and necessarily involve "guesswork" given the lack of recordkeeping regarding the resources and services provided to defendants by Olympia. *See* Pl.'s Mem. at 16-17, 19. Although defendants argue that the court should not pierce the corporate veil, they fail to respond to the form of the declaratory judgment sought. Given the absence of an opposition to the Receiver's requested form of declaratory judgment and, upon the court's own review of the record evidence, the court finds that the declaratory relief requested by the Receiver is appropriate.

## CONCLUSION

Because there is no issue of material fact with regard to whether defendants dominated and controlled Olympia to commit a wrong against plaintiff, the Receiver's motion for summary judgment to pierce defendants' corporate veil is granted. Accordingly, the Receiver's alternative request for partial summary judgment on her claim for moneys had and received is dismissed as

moot, and defendants' motion for summary judgment for rent due and owing is denied. Defendants' request for consolidation of this action with *Fannie Mae v. Olympia* in the event trial is necessary is also denied.

The Clerk of Court is directed to enter a declaratory judgment for plaintiff that provides that: (1) Olympia Mortgage Corporation ("Olympia") is the legal owner of all of the assets belonging to 1716 Realty Corporation and 1716 Realty LLC, including the right, title, and interest to the property known as 1716 Coney Island Avenue, Brooklyn, New York 11230 (the "Property"); (2) the Receivership, as ordered by the Court on November 23, 2004 in *Federal Nat'l Mortgage Ass'n v. Olympia Mortgage Corp.*, No. 04-4971 (E.D.N.Y. filed Nov. 16, 2004), extends to those assets formerly owned by defendants; (3) Olympia owes no past or future rent or other amounts to defendants in connection with its occupancy of the Property; and (4) 1716 Realty Corporation, 1716 Realty LLC, and all other persons claiming interest thereunder are barred from all claims to legal estate or interest in the Property and Olympia is entitled to sole and complete possession of the Property as the legal and equitable owner.

                                                **SO ORDERED.**

_____/s_____
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
       May 9, 2008